William Shea, Appellee, v. John Cassidy, Sr., Appellant.

**Gen. No. 33,772.**

Opinion filed May 28, 1930.

FREEMAN, MASON, IGOE & FLAHERTY, for appellant; GEORGE H. MASON, of counsel.

MICHAEL J. SULLIVAN and VERNON W. FOSTER, for appellee.

MR. JUSTICE RYNER delivered the opinion of the court.

On Sunday evening, October 3, 1926, the defendant shot the plaintiff in the arm. While there is some evidence that the injury was permanent, the principal issue presented by this appeal is whether the punitive damages allowed were excessive. The jury assessed

the damages at the sum of $50,000. The plaintiff agreed to a remittitur of $20,000. The trial court entered a judgment in favor of the plaintiff for $30,000. The defendant appealed.

The plaintiff kept company with the defendant's daughter from some time in August 1924, until the shooting took place. He was a frequent visitor at the home of the defendant until January 1, 1926. Some altercation took place on the latter date which resulted in his being ejected from the home of the defendant. After that he never entered the premises. The defendant testified that the plaintiff was drunk and annoying the girl who was washing the dishes. On cross-examination he said that the plaintiff annoyed the girl, Bridget McCourt, by "kidding" with her and breaking dishes. He admitted pushing the plaintiff out of the apartment but says that the latter struck him and broke his glasses.

The plaintiff testified that he went into the kitchen, merely to ask Bridget how she liked the States, as she had just recently come from Ireland; that the defendant told him to get out and kicked and struck him. In rebuttal he said that he had one drink of whiskey which he got in the defendant's home. The defendant was a former saloonkeeper. He further said that he did not put his hands upon the defendant or break his glasses. Bridget Woods, formerly Bridget McCourt, testified that she came to Chicago with the defendant's sister-in-law on January 1, 1926, and stayed at the home of the defendant for a short time; that the plaintiff asked if she liked this country; that he did not annoy her in any way and that he was not intoxicated.

The plaintiff after January 1, 1926, continued to see the defendant's daughter. He testified that they made appointments over the telephone and that they attended the same church.

The defendant lived in the third apartment in a building located at 7214 South Shore Drive, in the

City of Chicago. On the evening in question the plaintiff met the defendant's daughter at a nearby drug store. He had previously telephoned her. Her brother first answered the telephone and according to the plaintiff's testimony he was very gruff. She finally answered and met the plaintiff at the drug store. He asked her why she didn't put on a certain dress that he was fond of. They then went to the apartment so that she could change her costume.

According to the testimony of the plaintiff he accompanied her to the door of the vestibule and told her that he would meet her at the "South Shore View" but that she asked him to wait. That he went back to the main sidewalk leading into the entrance of the building when she suddenly exclaimed, "My God, look out"; that the son of the defendant, who weighed 200 pounds, sprang at him and attempted to strike him; that the defendant was immediately behind his son, armed with a gun, and fired when the plaintiff was facing him and only a short distance away; that the bullet missed him and he started running across the street when a second or third bullet pierced his arm. He further testified that he made no move towards either the defendant or his son and that he was unarmed.

Drew Eberson, a distinterested witness, witnessed the shooting. As abstracted, the substance of his testimony was:

"As I got in front of this apartment building, there were three people came out, two men and a girl; one was without his shirt, in his B. V. D.'s and he immediately commenced slugging and hit this one fellow and the girl screamed and tried to pull them apart, and the boy in his coat fought back a little, and he was rushed back to the parkway. About a minute of that and the apartment door opened and the older man came out with a gun in his hand and almost immediately he started to fire, and they separated and one

boy stood back in the parkway and (he) fired two or three shots at him. I thought they were blanks because he didn't drop or anything. He was not 15 feet away. Finally he turned and ran across the street and down the sidewalk, and the old man ran after him and fired one shot while running and I ran after him. I thought he was a thief or something. I stopped him 100 feet away and he turned around, and I asked him what the trouble was and he said, 'I'll kill that——.' ''

He further testified that the plaintiff was not armed.

Terrence N. Kelly, a police sergeant, testified that he heard two or three or four shots fired; that he met the plaintiff running down the street who said he was shot in the arm; that the defendant did not deny shooting the plaintiff; that the son went into the front room of the defendant's apartment and got the gun from under the cushion of a chair and gave it to the witness; that all of the chambers of the gun were loaded; and that the defendant said that the plaintiff had a gun which he threw away at the corner but that he and another officer searched the surrounding premises for a gun but were unable to find one.

Bridget Woods, formerly Bridget McCourt, testified that on October 3, 1926, she went to the defendant's apartment between three and four o'clock in the afternoon and remained there until two o'clock the following morning; that Mary Cassidy, the defendant's daughter, left the apartment, about eight-thirty in the evening; that about half an hour later the doorbell rang and the son of the defendant went down to answer the door; that he came back and said, "Papa, get the gun, it's Bill"; that he had already gotten the gun and both ran downstairs; that she looked out of the window, saw some people running down the street and heard four or five shots fired; that the defendant and his son came back upstairs, reloaded the gun, and went downstairs again and that when the police officer arrived the son took the gun from his father and

hid it under the seat of the davenport but later turned it over to the officer.

There was some medical testimony introduced on behalf of the plaintiff as to the extent and permanency of the plaintiff's injury, but we deem it unnecessary to discuss this evidence because it is evident from the amount of the verdict and the judgment of the court that the damages assessed were punitive and not compensatory.

John Cassidy, Jr., son of the defendant, testified that he was 28 years old, five feet and seven inches in height and weighed about 200 pounds; that he had been a marble cutter for about six years and prior to that time was a taxicab driver; that on the evening in question the plaintiff called upon the telephone at 7:30 and said, "I am coming over and get you and your father"; that he called his father two bad names and said, "I am coming to get you with a gun"; that he told the conversation to his father and he said, "Stay home tonight and protect me"; that he heard the doorbell ringing incessantly and that he went downstairs, possibly five or six steps from the bottom and saw the plaintiff with his left hand on the bell, "laying over in a drunken manner."

He further testified that he immediately ran upstairs and said, "Pa, here is Shea"; that he then went down again, "and started to humor the man" and asked him, "why are you going to shoot my father"; that the plaintiff said, "Come out here"; that during the struggle "I went ahead and saw his coat pushed back and I saw a revolver in there"; that the witness immediately ran upstairs and said, "Look out, Pa, he's got a gun"; that the plaintiff ran towards his father to shoot him; that his father shot at the plaintiff and the latter ran four or five feet and ran outside the building and across the lawn, and that his father then fired two shots in the air.

On cross-examination he testified that to gain admittance to the defendant's apartment, it was necessary to pass through two doors and that the inner door was always locked; that he opened the inner door and stepped out where the plaintiff was ringing the bell; that when the plaintiff telephoned he asked for Mary and that he replied, ''She is not here''; that the plaintiff then said, ''I am going over to get your son of a B. father and I am going to get you if you monkey around''; and that he was excited and did not see his sister at any time during the affray. The plaintiff and the witness Eberson both testified that the witness' sister was present.

The witness further said that he knew that the plaintiff was affiliated with a certain ''gang,'' naming the leader of it, and had threatened his father with them; that when the plaintiff was ringing the doorbell the witness went out and asked ''what was the idea of ringing the bell''; that the plaintiff then grabbed hold of him and ''was about to push the gun'' and then the witness ran and said, ''Pa, look out, he has got a gun''; that as he ran upstairs his father was coming down with a gun; that when he engaged in a scuffle with the plaintiff he saw a gun in the latter's right hand covered over with a ''spring coat,'' and that he did not get his father's gun for the police officer and that, so far as he knew, the gun was not reloaded. But the officer, Bridget Woods and the defendant all testified that he delivered the gun to the officer.

The defendant testified that he was about 68 years of age and was a salesman for an insurance company; that on the evening in question he heard the telephone ring and some loud words used and that his son came over to him and said, ''Shea is on the phone.'' He then relates what happened as follows:

''Well, my son went downstairs and the bell rang and my son went downstairs and he said Shea was

down there after the bell rang and he came up and told me. And of course I stuck my gun in my pocket and went downstairs and met Shea tusseling with my son in the hallway. So when I approached the outer hallway, Shea draws a gun on me, so I draws mine and shot him in the hand, first shot, and then he ran out the door and I shot two more in the air and he ran across the street on the east side of the drive there. It was pretty congested, so I didn't want to go any further than that, so I shot in the air and called to the police.''

On cross-examination he was asked if he didn't want to kill the plaintiff. He replied, ''Well, I am glad I didn't.'' He was pressed to answer a question as to whether, at the time, he wanted to kill him. His answer was, ''Well, he came there to kill me.'' He further testified that after shooting the plaintiff in the arm he followed him for about 15 feet on the lawn, and that he then went upstairs and put three new cartridges in his gun because he was afraid of the plaintiff. Finally when asked why he came downstairs again with the reloaded gun he said, ''In case he would come to get me he might have another one in his pocket,'' and ''He might be coming back and if he did and bothered me on my premises I would give him another one the same as I did before.''

The plaintiff, in rebuttal, testified that he did not enter the vestibule of the building in which the defendant's apartment was located; that he had nothing to drink on the day in question; that he made no threats over the telephone and that he never owned a gun or pistol in his life, and that he did not have one in his possession on October 3, 1926.

The first point urged as ground for a reversal of the judgment of the trial court is that the verdict was outrageously excessive and that the plaintiff admitted that it was excessive to the extent of $20,000 by con-

senting to the remittitur in that amount. There is much discussion about the damages actually sustained by the plaintiff, but that was not the sole basis before the jury in determining the amount of their verdict. They were instructed that they could assess punitive damages and it is evident that they did so.

But, it is contended that, considering the evidence in a light most favorable to the plaintiff, the amount of the defendant's financial worth did not exceed $220,000 and that the damages assessed are out of proportion with this amount. There is much argument in counsels' brief about the method of proving values of property. In the instant case, however, the exact value of the defendant's property holdings was not in issue. Furthermore, the defendant did not see fit to testify as to its value. If it was worth less than $220,000 he could have said so.

A number of cases are cited where the reviewing courts of this State have reversed the trial courts because of the allowance of excessive punitive damages, alone, or coupled with improper remarks of counsel or other errors. One was the case of the seduction of a man's wife. Another was a case of malicious prosecution. The other cases are of like nature. No case was cited, however, where one man, with malice in his heart, attempted to take the life of another man, and without provocation. Punitive damages are allowed, not for the purpose of compensating the plaintiff but to deter the defendant from committing a like offense in the future. No case has been brought to our attention which is parallel with the instant case.

According to his own admission, the defendant intended to kill the plaintiff. After shooting at him he followed him for some distance. He says he shot him in the hand when the plaintiff drew his gun, but the evidence shows that the bullet entered the back of the plaintiff's arm. This corroborates his statement that

he was shot while running. After shooting the plaintiff the defendant admitted that he reloaded the gun and came downstairs with the intention to ''give him another one'' if he came and bothered the defendant on his premises. The undisputed evidence shows that to gain entrance to the defendant's apartment the plaintiff would have had to pass through two locked doors. A man's home is his castle and he has the right to protect it against invasion but he has no right to go out into the street and attempt to kill a man who has done no act indicating that he has the intention of making forcible entry of the home. The jury evidently believed that the plaintiff was unarmed. The testimony of four witnesses and the facts and circumstances indicate strongly that he did not have a gun.

Complaint is made of instruction number 9 given at the request of the plaintiff because it authorized the jury, in considering the amount of damages to be assessed to take into consideration his bodily suffering and future suffering, when there was no pleading or evidence to warrant the consideration of such an element of damage. The point is without merit. The pleadings of the plaintiff charged the defendant with shooting him in the arm. It is conceded that he was shot. The plaintiff testified that he had pains for some time but that they were not very serious. But the issue is whether punitive damages in the amount allowed by the court should have been assessed and whether the plaintiff would probably suffer in the future as a result of the wound, was of minor consequence. That he suffered pain at the time he was shot may be inferred. What has been said with reference to this instruction applies to the objections to other instructions. There is no complaint about the instruction given with reference to the fixing of punitive damages.

It is also urged that the judgment should be reversed because of improper conduct on the part of counsel

for the plaintiff. In his opening statement plaintiff's counsel said that the defendant was worth a half of a million dollars and extensively in the mortgage business. There was some evidence tending to show that he was worth $220,000. If he was not worth that amount he could have testified as to his actual worth. He also asked the defendant if he retained in his home a very large supply of liquor from the place of business which he formerly conducted. An objection to the question was promptly sustained and no answer was given. Again he asked the plaintiff whether, at the time of the affray, he expected to marry the defendant's daughter. Before he asked the question he warned the witness not to answer until counsel for the defendant was given an opportunity to object. An objection was interposed and sustained. We do not consider that the conduct of counsel was such as to warrant a reversal of the judgment of the trial court.

It is evident that neither the jury nor the court believed the testimony of the defendant and his son except in so far as it amounted to a confession of guilt. The version of the facts given by them is highly improbable.

The judgment of the superior court of Cook county is affirmed.

*Judgment affirmed.*

WILSON, P. J., and HOLDOM, J., concur.